Opinion by Judge BEA; Dissent by Judge REINHARDT.
BEA, Circuit Judge:
I. Introduction
We are called upon to decide whether the teacher-led recitation of the Pledge of Allegiance to the Flag of the United States of America, and to the Republic for which it stands, by students in public schools constitutes an establishment of religion prohibited by the United States Constitution. We hold it does not; the Pledge is constitutional.
The Pledge of Allegiance serves to unite our. vast nation through the proud recitation of some of the ideals upon which our Republic was founded and for which we continue to strive: one Nation under God — the Founding Fathers’ belief that the people of this nation are endowed by their Creator with certain inalienable rights; indivisible — -although we have individual states, they are united in one Republic; with liberty — the government cannot take away the people’s inalienable rights; and justice for all — -everyone in America is entitled to “equal justice under the law” (as is inscribed above the main entrance to our Supreme Court). Millions of people daily recite these words when pledging allegiance to the United States of America:
I pledge allegiance to the Flag of the United States of America, and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.
4 U.S.C. § 4 (2002).
Pursuant to California Education Code § 52720, the Rio Linda Union School District in California (“the School District”) has a practice that every morning, willing students, led by their teachers, face the American Flag, place their right hands over their hearts, and recite the Pledge of Allegiance.
Plaintiff Jan Roe is a self-proclaimed atheist whose child, RoeChild-2, attends elementary school in the School District. Roe filed suit alleging that the words “under God” in the Pledge offend her belief that there is no God, interfere with her right to direct her child’s upbringing, and indoctrinate her child with the belief that God exists. The parties have stipulated *1013 that RoeChild-2 has never recited the Pledge, but Roe nevertheless asks us to prohibit the recitation of the Pledge by other students. Thus, this case presents a familiar dilemma in our pluralistic society — how to balance conflicting interests when one group wants to do something for patriotic reasons that another groups finds offensive to its religious (or atheistic) beliefs. In other words, does Roe have the right to prevent teachers from leading other students from reciting the Pledge of Allegiance — something we all agree is a patriotic exercise — because the mention of God in the Pledge offends her as an atheist?
Plaintiffs challenge the School District’s policy as constituting a violation of the Establishment Clause: “Congress shall make no law respecting an establishment of religion.” U.S. Const, amend. I.
The Pledge reflects many beliefs held by the Founding Fathers of this country — the same men who authored the Establishment Clause — including the belief that it is the people who should and do hold the power, not the government. They believed that the people derive their most important rights, not from the government, but from God:
We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain tmalienable Rights, that among these are Life, Liberty and the pursuit of Happiness.
The Declaration of Independence, 1 U.S.C. § XLIII (1776) (emphasis added). The Founders did not see these two ideas— that individuals possessed certain God-given rights which no government can take away, and that we do not want our nation to establish a religion — as being in conflict.
Not every mention of God or religion by our government or at the government’s direction is a violation of the Establishment Clause. See Lynch v. Donnelly, 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984) (“Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.”). The Supreme Court has upheld several government actions that contained a religious element against Establishment Clause claims: a display of the Ten Commandments on the Texas State Capitol grounds;[1] the display of a Chanukah menorah outside a City-County Building;[2] the display of a Nativity scene in a public Christmas display;[3] a state legislature’s practice of opening each day with a prayer led by a chaplain paid with state funds;[4] a state’s property tax exemption for religious organizations;[5] and a township’s program for reimbursing parents for the cost of transporting their children to parochial schools.[6] Each of these cases involved religion. But taken in context, none of the government actions violated the Establishment Clause.
The plaintiffs and the dissent focus solely on the words “under God” in isolation, *1014 stripped of all context and history. Plaintiffs and the dissent even go so far • as to disregard the plain text of the preamble to 4 U.S.C. § 4 which sets forth that Congress had two primary purposes in including the phrase “one nation under God” in the Pledge: (1) to underscore the political philosophy of the Founding Fathers that God granted certain inalienable rights to the people which the government cannot take away; and (2) to add the note of importance which a Pledge to our Nation ought to have and which ceremonial references to God invoke. The Supreme Court has instructed us to do otherwise: “Focus exclusively on the religious component of any [governmental] activity would inevitably lead to its invalidation under the Establishment Clause.” Lynch, 465 U.S. at 678, 104 S.Ct. 1355. Were the correct focus as the dissent suggests, all of the above examples would have been found to violate the Establishment Clause, for all contain religious symbols or words. On the contrary, under Supreme Court law we are instructed to examine the history and context in which the phrase “one Nation under God” is used so that we may discern Congress’ “ostensible and predominant” purpose when it enacted the Pledge. See McCreary County v. ACLU, 545 U.S. 844, 867-68, 125 S.Ct. 2722, 162 L.Ed.2d 729 (2005). Because California Education Code § 52720 as implemented by the School District’s Policy requires the recitation of the Pledge as a whole, we must examine the Pledge as a whole, not just the two words the Plaintiffs find offensive. In doing so, we find the Pledge is one of allegiance to our Republic, not of allegiance to the God or to any religion. Furthermore, Congress’ ostensible and predominant purpose when it enacted and amended the Pledge over time was patriotic, not religious.
The Supreme Court has agreed the Pledge is a “patriotic exercise designed to foster national unity and pride.” Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 6, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). Even the dissent agrees on this determinative point. Dissent at 4040 (“[T]he recitation of the Pledge both as originally written and as amended is a patriotic exercise.... ”). The question about which we disagree is whether this patriotic activity is turned into a religious activity because it includes words with religious meaning.
We hold that the Pledge of Allegiance does not violate the Establishment Clause because Congress’ ostensible and predominant purpose was to inspire patriotism and that the context of the Pledge — its wording as a whole, the preamble to the statute, and this nation’s history — demonstrate that it is a predominantly patriotic exercise. For these reasons, the phrase “one Nation under God” does not turn this patriotic exercise into a religious activity.
Accordingly, we hold that California’s statute requiring school districts to begin the school day with an “appropriate patriotic exercise” does not violate the Establishment Clause even though it permits teachers to lead students in recitation of the Pledge. California Education Code § 52720. In doing so we join our sister circuits who have held similar school policies do not violate the Establishment Clause. See Myers v. Loudoun County Pub. Schs., 418 F.3d 395, 409 (4th Cir.2005) (upholding a Virginia statute requiring the daily recitation of the Pledge of Allegiance by students, but allowing students to sit or stand quietly if they object); Sherman v. Cmty. Consol. Sch. Dist. 21 of Wheeling Twp., 980 F.2d 437, 447 (7th Cir.1992), cert. denied, 508 U.S. 950, 113 S.Ct. 2439, 124 L.Ed.2d 658 (1993) (same *1015 as to an Illinois statute).[7] Therefore, we reverse the district court’s judgment and vacate the permanent injunction prohibiting the daily recitation of the Pledge in the School District.
II. The Procedural History of this Case
This is not the first time the Pledge has been challenged in our Circuit. In 2000, Newdow brought a similar Establishment Clause challenge against the Elk Grove Unified School District’s policy requiring teachers to lead their classes in the recitation of the Pledge. Newdow v. United States Congress, 2000 WL 35505916, at *1 (E.D.Cal. July 21, 2000). The district court rejected Newdow’s challenge and dismissed his complaint. Id.
A divided panel of this Circuit reversed. Newdow v. United States Congress, 292 F.3d 597 (9th Cir.2002) (“Newdow /”). In its opinion, the panel held Newdow had standing as a parent to challenge Elk Grove’s Pledge-recitation policy, because the policy interfered with his right to direct his daughter’s religious upbringing. Id. at 602. Over Judge Fernandez’s dissent, the majority (of which Judge Reinhardt was a member) held Elk Grove’s policy violated the Establishment Clause. Id. at 612.
Following the panel’s decision in Newdow I, the mother of Newdow’s daughter intervened in the case to challenge Newdow’s standing to sue on the basis that a California Superior Court had awarded her sole legal custody of the daughter. Newdow v. United States Congress, 313 F.3d 500, 502 (9th Cir.2002) (“Newdow II”). The panel held the custody order did not deprive Newdow of standing to challenge the Elk Grove Pledge-recitation policy, even though he had lost custody of his daughter. Id. at 502-03.
The panel then issued an order amending its opinion in Neivdow I and denying panel rehearing and rehearing en banc. Newdow v. United States Congress, 328 F.3d 466 (9th Cir.2003) (“Newdow III”). The amended opinion did not reach the question whether the Pledge was constitutional and instead invalidated, again over Judge Fernandez’s dissent, only the Elk Grove School District’s policy. Id. at 490. Nine judges of our Circuit dissented from the denial of rehearing en banc. See Newdow III, 328 F.3d at 471, 482.
The Supreme Court of the United States reversed. Elk Grove, 542 U.S. at 5, 124 S.Ct. 2301. The Court held that Newdow, as a noncustodial parent with interests potentially adverse to those of his daughter, failed to satisfy the requirements of “prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction.” Id. at 11, 124 S.Ct. 2301 (citation and internal quotation marks omitted). Accordingly, the Court held the Newdow III panel erred by reaching the merits of Newdow’s Establishment Clause challenge. Id. at 17, 124 S.Ct. 2301.
Plaintiffs, including Jan Roe who has full custody of her daughter, filed this action contending the teacher-led recitation of the Pledge in California public schools violates the Establishment Clause. Newdow v. United States Congress, 383 F.Supp.2d 1229 & n. 1 (E.D.Cal.2005) (“Newdow IV”).
The district court dismissed the majority of plaintiffs’ claims. As to the plaintiffs’ Establishment Clause claim against the recitation of the Pledge in the School District, the district court held this court’s decision in Newdow III remained binding *1016 authority, despite the Supreme Court’s decision in Elk Grove Unified Sch. Dist. v. Newdow. Newdow IV, 383 F.Supp.2d at 1240-41. Relying on Newdow III, the district court held the School District’s Policy requiring the daily, voluntary recitation of the Pledge by students violated the Establishment Clause. “Because this court is bound by the Ninth Circuit’s holding in Newdow III, it follows that the school districts’ policies violate the Establishment Clause. Accordingly, upon a properly-supported motion, the court must enter a restraining order to that effect.” Id. at 1242. The district court stayed the permanent injunction pending any appeals to this court and to the Supreme Court. This timely appeal followed.
III. Standard of Review
We review a district court’s grant of a permanent injunction for abuse of discretion. Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1176 (9th Cir.2002). However, we review legal questions underlying the district court’s grant of injunctive relief de novo. Id. Whether a statute violates the Establishment Clause is a question of law we review de novo. Vasquez v. Los Angeles County, 487 F.3d 1246, 1254 (9th Cir.2007).
IV. Standing
It is important to distinguish exactly which statutes are challenged on appeal and which are not. Only California Education Code § 52720 and the School District’s Policy are at issue in this case. The district court dismissed plaintiffs’ challenge to the 1954 Amendment to the Pledge, and them direct challenge to the Pledge, as codified in 4 U.S.C. § 4. Newdow TV, 383 F.Supp.2d at 1242. Plaintiffs did not cross-appeal this dismissal of their claims challenging the 1954 amendment to the Pledge and the codification of the Pledge at 4 U.S.C. § 4, and therefore they have abandoned those claims on appeal.
Even though Plaintiffs do not assert they have standing to challenge the 1954 Amendment, the Dissent assumes they do. Plaintiffs do not have standing to challenge the 1954 Amendment because no federal statute requires plaintiffs to recite the Pledge. Even under the School District’s Policy, children “may choose not to participate in the flag salute for personal reasons” or they can simply omit any words they find offensive.
To satisfy standing requirements, a plaintiff must prove: “(1) he has suffered an ‘injury in fact’ that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.” Friends of the Earth, Inc. v. Laidlaw Envt’l. Servs. (TOC), Inc. 528 U.S. 167, 180-81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).
Plaintiffs are unable to show the 1954 amendment causes them to suffer any concrete and particularized injury because nothing in the Pledge actually requires anyone to recite it. To the contrary, however, because the Pledge does not mandate that anyone say it, Newdow has no personal injury to contest its wording in the courts. Rather, his remedy must be through the legislative branch.
 Instead of a particularized injury, plaintiffs would, at most, be asserting “generalized grievances more appropriately addressed in the representative branches”, which do not confer standing. Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); see also Val *1017 ley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 489-90 n. 26, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). Additionally, the 1954 Amendment did not involve Congress’ power to tax and spend, U.S. Const, art. I § 8, so the narrow exception established in Flast v. Cohen, 392 U.S. 83, 88, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), allowing a taxpayer to bring an Establishment Clause challenge to the use of public funds does not apply.
V. The Lemon Test
We turn now to the merits of the plaintiffs’ Establishment Clause claims.[8] There are three possible tests for determining whether a statute violates the Establishment Clause—the Lemon test, the Endorsement test and the Coercion Test. We examine each in turn.
Plaintiffs contend the School District’s policy violates the Establishment Clause test announced in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), commonly known as the “Lemon test.” Although the Lemon test has been widely criticized, our court has reaffirmed its continuing vitality. See Card v. City of Everett, 520 F.3d 1009, 1013 (9th Cir.2008); Access Fund v. USDA 499 F.3d 1036, 1042 (9th Cir.2007) (“The Lemon test remains the benchmark to gauge whether a particular government activity violates the Establishment Clause.”).
Under the Lemon test, to be constitutional (1) the challenged governmental action must have a secular purpose; (2) “its principal or primary effect must be one that neither advances nor inhibits religion”; and (3) it “must not foster an excessive government entanglement with religion.” Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105 (citations and internal quotation marks omitted). The School District’s Policy must satisfy all three prongs of the Lemon test. Under each prong of this test, we first examine California Education Code § 52720 and the School District’s Policy and then, because the School District’s Policy states that recitation of the Pledge will suffice, we also examine the Pledge.
VI. California Education Code § 52720 and the School District’s Policy Are Constitutional under the Lemon test.
California Education Code § 52720 states as follows:
In every public elementary school each day during the school year at the beginning of the first regularly scheduled class or activity period at which the majority of the pupils of the school normally begin the school day, there shall be conducted appropriate patriotic exercises. The giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy the requirements of this section.
In every public secondary school there shall be conducted daily appropriate patriotic exercises. The giving of the Pledge of Allegiance to the Flag of the United States of America shall satisfy such requirement. Such patriotic exercises for secondary schools shall be conducted in accordance with the regulations which shall be adopted by the governing board of the district maintaining the secondary school.
To comply with California Education Code § 52720, the Rio Linda Union School District adopted the following policy (“The School District’s Policy”):
*1018 Patriotic Exercises
Each school shall conduct patriotic exercises daily. At elementary schools, such exercises shall be conducted at the beginning of each school day. The Pledge of Allegiance to the flag will fulfill this requirement. (Education Code § 52720)
Individuals may choose not to participate in the flag salute for personal reasons.
All parties agree that the “ostensible and predominant” purpose of both California Education Code § 52720 and the School District’s Policy is patriotic. We agree. The plain wording of California Education Code § 52720 and the School District’s Policy both express a secular purpose: to encourage the performance of patriotic exercises in public school. Not only does the plain wording provide for the students to begin the day with a “patriotic exercise”, but it does not mandate the text of the Pledge or any other patriotic exercise. The Pledge is one acceptable alternative. Because only a patriotic exercise is encouraged and no particular text is mandated, the California statute and the School District’s policy are neutral toward religion. See Wallace v. Jaffree, 472 U.S. 38, 55 n. 37, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).
Lemon’s second prong is also met. The effect of California Education Code § 52720 and the School District’s Policy is stated quite clearly in each: each school shall conduct “appropriate patriotic exercises” daily. There is no mention of anything religious in either. Further, although the recitation of the Pledge “shall satisfy” this requirement, it is not mandated under California law. Schools could decide to have the children learn and recite a different historical document each week, or participate in another patriotic activity, such as working on a project to help the nation. Recitation of the Pledge is just one of many ways to satisfy this patriotic requirement.
Plaintiffs also concede that Lemon’s third prong, “excessive [governmental] entanglement” with religion, is not violated by California Education Code § 52720 or the School District’s Policy, and we agree. Neither involves any entanglement with religion at all, let alone excessive entanglement. Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105.
VII. The Pledge of Allegiance Is Constitutional under the Lemon test.
Because the School District’s Policy states that recitation of the Pledge will fulfill the policy, we also examine the Pledge itself. We begin our analysis with the least controversial elements of the Lemon test in this case.
A. The Pledge does not involve any excessive entanglement with religion.
Plaintiffs concede that the Pledge does not violate Lemon’s third prong, “excessive [governmental] entanglement” with religion, and we agree. There is no excessive entanglement with religion. Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105.
B. The primary or principal effect of the Pledge is neither to advance nor inhibit religion.
The Supreme Court has said the Pledge is a “common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles.” Elk Grove, 542 U.S. at 6, 124 S.Ct. 2301. The Pledge also has the permissible secular effect of promoting an appreciation of the values and ideals that define our nation. The recitation of the Pledge is designed to evoke feelings of patriotism, pride, and love of country, not of divine fulfillment or spiritual enlighten *1019 ment. In sum, the students are simply supporting the nation through their Pledge “to the Flag of the United States of America and to the Republic for which it stands.” Thus, the Pledge passes Lemon’s second prong.
Next, we turn to the hotly contested issue in this case, whether Congress’ purpose in enacting the Pledge of Allegiance was predominantly patriotic or religious.
C. Congress’ purpose in enacting the Pledge of Allegiance was patriotic.
Under Lemon’s first prong, governmental action is unconstitutional only if it has the “ostensible and predominant purpose of advancing religion.” McCreary County, 545 U.S. at 860, 125 S.Ct. 2722. We must defer to the government’s articulation of a secular purpose, of which patriotism is one; however, the government’s stated purpose must be sincere, not a sham. Edwards v. Aguillard, 482 U.S. 578, 586-87, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987).
In 2002, Congress’ purpose in reaffirming the Pledge by enacting 4 U.S.C. § 4 was predominantly secular. The phrase “under God”, when read in context with the whole of the Pledge, has the predominant purpose and effect of adding a solemn and inspiring note to what should be a solemn and inspiring promise — a promise of allegiance to our Republic.

1. We must examine the Pledge as a whole.

When it comes to testing whether words and actions are violative of the Establishment Clause, context is determinative. The dissent analyzes only the words “under God”, instead of analyzing the context in which those words appear.[9] The Supreme Court has specifically rejected such a limited analysis: “[the dissenting Justices] would cut context out of the inquiry, to the point of ignoring history, no matter what bearing it actually had on the significance of current circumstances. There is no precedent for [their] arguments, or reason supporting them.” McCreary County, 545 U.S. at 864, 125 S.Ct. 2722. Further, “[t]he eyes that look to purpose belong to an ‘objective observer’ ... one presumed to be familiar with the history of the government’s actions and competent to learn what history has to show.” Id. at 864-66, 125 S.Ct. 2722 (quoting Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000)).
The dissent suggests that we should look only at the 1954 textual amendments to the Pledge. See Dissent at 1064-65, 1079-80. We disagree. Wallace looked not only to the textual difference between two statutes, but also to the legislative record surrounding the second statute, to the statute’s sponsor’s testimony before the district court, and to the information Governor Wallace supplied in his answer to plaintiff Jaffree’s complaint, and to the character of a statute on a similar topic passed one year later. Wallace, 472 U.S. at 56-60, 105 S.Ct. 2479 (1985). Following Wallace’s holistic approach, we must examine the relevant history.
*1020 “[T]he question is what viewers may fairly understand to be the purpose of the display. That .inquiry, of necessity, turns upon the context in which the contested object appears.” McCreary County, 545 U.S. at 867-68, 125 S.Ct. 2722 (quoting County of Allegheny v. ACLU, 492 U.S. 573, 595, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989)). The California statute and the School District’s Policy provide for recitation of the entire Pledge, not just the two words to which the plaintiffs and the dissent object. Accordingly, we examine the Pledge as a whole.
In the previous case brought by Newdow, the Supreme Court recognized why we pledge allegiance to the flag:
The very purpose of a national flag is to serve as a symbol of our country, and of its proud traditions of freedom, of equal opportunity, of religious tolerance, and of good will for other peoples who share our aspirations. As its history illustrates, the Pledge of Allegiance evolved as a common public acknowledgment of the ideals that our flag symbolizes. Its recitation is a patriotic exercise designed to foster national unity and pride in those principles.
Elk Givve, 542 U.S. at 5, 124 S.Ct. 2301 (internal citations and quotation marks omitted).
The Supreme Court has held prayers, invocations and other overtly religious activities in public school violate the Establishment Clause. A student-led prayer before high school football games;[10] a prayer delivered by a clergyman in a high school graduation ceremony;[11] a period of silence in a public school for “meditation or voluntary prayer;”[12] a required Bible reading before each school day;[13] and a daily prayer[14] all have been invalidated by the Supreme Court as unconstitutional school-sponsored religious exercises.
All of the religious exercises invalidated in those cases shared a fundamental characteristic absent from the recitation of the Pledge: the exercise, observance, classroom lecture, or activity was predominantly religious in nature — a prayer, invocation, petition, or a lecture about “creation science.”[15]
*1021 The purpose of public prayer is always active — to invite divine intercession, to express personal gratitude, to ask forgiveness, etc. On the other hand, the recitation of “one Nation under God” is a description of the Republic rather than an expression of the speaker’s particular theological beliefs, a recognition of the historical principles of governance, affected by religious belief, embedded in the Pledge. “[Our] institutions presuppose a Supreme Being.” Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952).
The dissent states that the mere recitation of “under God” in the Pledge is an affirmation that God exists: it “ ‘requires affirmation of a belief and an attitude of mind’ to which young Roe does not subscribe: a belief that God exists and is watching over our nation.” Dissent at 1075-76 (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 633, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)). If in fact the students were required to say the Pledge, the dissent would have a valid point. But the California legislature has already taken this consideration into account by allowing anyone not to say the Pledge, or hear the Pledge said, for any personal reason. What is at issue is not saying the Pledge or affirming a belief in God. What is at issue is whether Roechild can prevent other students, who have no such objection, from saying the Pledge.
In contending the Pledge is an unconstitutional religious exercise, plaintiffs erroneously fixate solely on the words “under God” and disregard the context in which those words appear. True, the words “under God” have religious significance. This, however, does not convert the Pledge into a prayer or other religious exercise. As the Supreme Court has explained, “Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause.” Lynch, 465 U.S. at 680, 104 S.Ct. 1355. Under the dissent’s rationale, every government action that had any religious component to it would violate the Establishment Clause. But that is clearly not the case, as the Supreme Court has repeatedly told us. See also discussion at pages 1075-76 supra.
Where the very same religious symbols are displayed for traditional cultural purposes and in a context evoking themes and values other than religion, they have been found not to violate the Establishment Clause. See Van Orden v. Perry, 545 U.S. 677, 681, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (upholding a Ten Commandments display on state capitol grounds among other historical monuments); Lynch, 465 U.S. at 670-71, 680, 687, 104 S.Ct. 1355 (upholding a creche displayed as just one part of a city’s annual Christmas display because the creche depicted the “historical *1022 origins of this traditional event long recognized as a National Holiday”).
The Supreme Court’s most recent pronouncements on the Establishment Clause, Van Orden and McCreary County, are instructive on the importance of context. Van Orden and McCreary County were decided on the same day in 2005. Although a display containing the Ten Commandments was at issue in both cases, the Court upheld the display in Van Orden, but invalidated it in McCreary County. The words displayed were the same, but the context made all the difference:
On the one hand, the Commandments’ text undeniably has a religious message, invoking, indeed emphasizing, the Deity. On the other hand, focusing on the text of the Commandments alone cannot conclusively resolve this case. Rather, to determine the message that the text here conveys, we must examine how the text is used. And that inquiry requires us to consider the context of the display.
Van Orden, 545 U.S. at 700-01, 125 S.Ct. 2854 (Breyer, J., concurring) (emphasis in original).
The Ten Commandments display in Van Orden was in a state park that contained both religious and secular monuments and historical markers. Van Orden, 545 U.S. at 681, 125 S.Ct. 2854. In contrast, the Ten Commandments display in a Kentucky courthouse appeared alone and thus the “unstinting focus was on religious passages.” McCreary County, 545 U.S. at 870, 125 S.Ct. 2722. Only after the display was challenged did the County add other displays to the area. Id. As we discuss, infra at page 3896, fn. 19, the 2002 Act is distinguishable from the actions of McCreary County.
Just as the text of the Ten Commandments display may be constitutional in one context but not the other, the word “God” may violate the Establishment Clause when placed in one context, but not another. For example, a school district’s policy requiring teachers to lead students in reciting, “We give thanks to You, Lord, for keeping us alive, sustaining us and allowing us to reach this special, happy occasion,” constitutes a prayer or religious exercise violative of the Establishment Clause. Lee, 505 U.S. at 582, 112 S.Ct. 2649 (citation and internal quotation marks omitted). There, the word “Lord,” like the Ten Commandments display in McCreary County, is placed in a wholly religious context and is surrounded by words whose “unstinting focus” are religious. Not so, the same word “Lord” on the granite monument in Van Orden, surrounded by other monuments and historical objects.[16] Likewise, the phrase “one Nation under God” in the Pledge appears as part of a pledge of allegiance to “the Flag of the United States of America, and to the Republic for which it stands,” not a personal pledge of *1023 allegiance to God. The Pledge recitation is led by a teacher, not by a clergyman or other religious leader. Cf. Lee, 505 U.S. at 586, 587, 112 S.Ct. 2649. The students doff baseball caps; they do not kneel, nor don yarmulkes, veils or rosaries. The Pledge is thus distinguishable from the school-sponsored prayers invalidated by the Supreme Court in Lee and Wallace.
Nevertheless, the dissent would have us ignore the wording of the Pledge as a whole to focus only on one portion of the Pledge, the portion plaintiffs find objectionable, because in Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), the Court examined an amendment to a statute to provide for prayer. We must disagree with the dissent as to its application of Wallace to this case. In Wallace, the parents of public school children challenged an amendment to a state statute which had provided for a moment of silence at the beginning of each day in the public schools. The challenged amendment changed the purpose of the moment of silence from “meditation” to “meditation or voluntary prayer.” Id. at 58-59, 105 S.Ct. 2479 (emphasis added); Ala.Code § 16-1-20.1 (1984). This statute was enacted the year before another statute, Alabama Code § 16-1-20.2, which provided the text of a prayer to be said each day by the students.[17] This combination of “voluntary prayer” and the suggested prayer to be said out loud left no doubt that the purpose of the statute was to promote religion.
Focusing, as we must, on how the text of the statute is used, Van Orden, 545 U.S. at 701, 125 S.Ct. 2854 (Breyer, J., concurring), we see that the addition of “or voluntary prayer” to the statute in Wallace was used to encourage students to participate in a religious exercise — the very prayer enacted in Alabama Code § 16-1-20.2. Here, the addition of “under God” was used to describe an attribute of the Republic, “one Nation under God” — a reference to the historical and religious traditions of our country, not a personal affirmation through prayer or invocation that the speaker believes in God.

2. The legislative history shows Congress had a predominantly patriotic purpose when it enacted the Pledge.

Lemon mandates our inquiry look to the “plain meaning of the statute’s words, enlightened by their context and the contemporaneous legislative history [and] the historical context of the statute, ... and the specific sequence of events leading to [its] passage.” McCreary County, 545 U.S. at 862, 125 S.Ct. 2722 (quoting from Edwards, 482 U.S. at 594-95, 107 S.Ct. 2573) (alteration in original). The dissent fails to do any of this.
In 2002, Congress reaffirmed the current Pledge, which now includes references to how it is to be recited and which specifically sets forth Congress’ reasons *1024 for the “plain meaning of the statute’s words.” See Pub.L. No. 107-293, 116 Stat. 2057 (codified as amended in 4 U.S.C. § 4, 36 U.S.C. § 302) (effective November 13, 2002). It is the 2002 statute — 4 U.S.C. § 4 — that sets forth our current Pledge. It is the contemporaneous legislative history of the 2002 Act which should tell us the purpose of the Congress in 2002 that is relevant to our inquiry because that is the statute that was in force when Roe Child-2 heard her schoolmates recite the Pledge and when Jan Roe brought this action. It remains the current statute. It is the “specific sequence of events” leading to the passage of the 2002 Act we must consider.[18]
In determining Congress’ purpose under the Lemon test, “[t]he starting point in every case involving construction of a statute is the language itself.” Edwards, 482 U.S. at 597-98, 107 S.Ct. 2573 (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (Powell, J., concurring)). The primary flaw in the dissent’s reasoning is that, because the secular reasons given directly in the statute do not lead to the dissent’s desired result, the dissent ignores those reasons and instead focuses on the statements of individual legislators making statements in an election year. The Supreme Court has been very clear that we are not to do this:
As an initial matter, the [text of the statute] is a sufficient basis for meeting the secular purpose prong of the Lemon test. See Edwards v. Aguillard, 482 U.S. 578, 586, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ([The] Court “is normally deferential to a [legislative] articulation of a secular purpose”); Mueller v. Allen, 463 U.S. 388, 394-95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) ([The] Court is “reluctan[t] to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State’s program may be discerned from the face of the statute”). ... Even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law.
Bd. of Educ. of Westside Comm. Sch. v. Mergens, 496 U.S. 226, 248-49, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (emphasis added).
With the 2002 Act, Congress “reaffirmed the exact language that has appeared in the Pledge for decades.” See Pub.L. No. 107-293, 116 Stat.2057 at 2060 (codified as amended in 4 U.S.C. § 4, 36 U.S.C. § 302) (effective November 13, 2002). McCreary County tells us we must also consider the legislative history of this act to determine its predominant purpose and effect.[19]
*1025 Congress chose to explain in great detail its purpose in reaffirming the language of the Pledge, for although it did not amend the text of the Pledge, it did extensively amend the text of the statute enacting the Pledge, setting forth its specific purposes in the following extensive legislative findings: [20]
Congress finds the following:
(1) On November 11, 1620, prior to embarking for the shores of America, the Pilgrims signed the Mayflower Compact that declared: “Having undertaken, for the Glory of God and the advancement of the Christian Faith and honor of our King and country, a voyage to plant the first colony in the northern parts of Virginia,”.
(2) On July 4, 1776, America’s Founding-Fathers, after appealing to the “Laws of Nature, and of Nature’s God” to justify their separation from Great Britain, then declared: “We hold these Truths to be self-evident, that all Men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the Pursuit of Happiness”.
(3) In 1781, Thomas Jefferson, the author of the Declaration of Independence and later the Nation’s third President, in his work titled “Notes on the State of Virginia” wrote: “God who gave us life gave us liberty. And can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are of the Gift of God. That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that his justice cannot sleep forever.”.
(4) On May 14, 1787, George Washington, as President of the Constitutional Convention, rose to admonish and exhort the delegates and declared: “If to please the people we offer what we ourselves disapprove, how can we afterward defend our work? Let us raise a standard to which the wise and the honest can repair; the event is in the hand of God!”.
(5) On July 21, 1789, on the same day that it approved the Establishment Clause concerning religion, the First Congress of the United States also passed the Northwest Ordinance, providing for a territorial government for lands northwest of the Ohio River, which declared: “Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged.”.
(6) On September 25, 1789, the First Congress unanimously approved a resolution calling on President George Washington to proclaim a National Day of Thanksgiving for the people of the United States by declaring, “a day of *1026 public thanksgiving and prayer, to be observed by acknowledging, with grateful hearts, the many signal favors of Almighty God, especially by affording them an opportunity peaceably to establish a constitution of government for their safety and happiness.”.
(7) On November 19, 1863, President Abraham Lincoln delivered his Gettysburg Address on the site of the battle and declared: “It is rather for us to be here dedicated to the great task remaining before us — that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion — that we here highly resolve that these dead shall not have died in vain — that this Nation, under God, shall have a new birth of freedom — and that Government of the people, by the people, for the people, shall not perish from the earth.”.
(8) On April 28, 1952, in the decision of the Supreme Court of the United States in Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), in which school children were allowed to be excused from public schools for religious observances and education, Justice William O. Douglas, in writing for the Court stated: “The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concern or union or dependency one on the other. That is the common sense of the matter. Otherwise the State and religion would be aliens to each other—hostile, suspicious, and even unfriendly. Churches could not be required to pay even property taxes. Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; ‘so help me God’ in our courtroom oaths— these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: ‘God save the United States and this Honorable Court.’ ”.
(9) On June 15, 1954, Congress passed and President Eisenhower signed into law a statute that was clearly consistent with the text and intent of the Constitution of the United States, that amended the Pledge of Allegiance to read: “I pledge allegiance to the Flag of the United States of America and to the Republic for which it stands, one Nation under God, indivisible, with liberty and justice for all.”.
(10) On July 20, 1956, Congress proclaimed that the national motto of the United States is “In God We Trust”, and that motto is inscribed above the main door of the Senate, behind the Chair of the Speaker of the House of Representatives, and on the currency of the United States.
(11) On June 17, 1963, in the decision of the Supreme Court of the United States in Abington School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), in which compulsory school prayer was held unconstitutional, Justices Goldberg and Harlan, concurring in the decision, stated: “But untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive *1027 devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it. Neither government nor this Court can or should ignore the significance of the fact that a vast portion of our people believe in and worship God and that many of our legal, political, and personal values derive historically from religious teachings. Government must inevitably take cognizance of the existence of religion and, indeed, under certain circumstances the First Amendment may require that it do so.”.
(12)On March 5, 1984, in the decision of the Supreme Court of the United States in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), in which a city government’s display of a nativity scene was held to be constitutional, Chief Justice Burger, writing for the Court, stated: “There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789 ... [E]xamples of reference to our religious heritage are found in the statutorily prescribed national motto ‘In God We Trust’ (36 U.S.C. 186), which Congress and the President mandated for our currency, see (31 U.S.C. 5112(d)(1) (1982 ed.)), and in the language ‘One Nation under God’, as part of the Pledge of Allegiance to the American flag. That pledge is recited by many thousands of public school children — and adults — every year ... Art galleries supported by public revenues display religious paintings of the 15th and 16th centuries, predominantly inspired by one religious faith. The National Gallery in Washington, maintained with Government support, for example, has long exhibited masterpieces with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection, among many others with explicit Christian themes and messages. The very chamber in which oral arguments on this case were heard is decorated with a notable and permanent — not seasonal — symbol of religion: Moses with the Ten Commandments. Congress has long provided chapels in the Capitol for religious worship and meditation.”.
(13) On June 4, 1985, in the decision of the Supreme Court of the United States in Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), in which a mandatory moment of silence to be used for meditation or voluntary prayer was held unconstitutional, Justice O’Connor, concurring in the judgment and addressing the contention that the Court’s holding would render the Pledge of Allegiance unconstitutional because Congress amended it in 1954 to add the words “under God,” stated “In my view, the words ‘under God’ in the Pledge, as codified at (36 U.S.C. 172), serve as an acknowledgment of religion with ‘the legitimate secular purposes of solemnizing public occasions, [and] expressing confidence in the future.’ ”.
(14) On November 20, 1992, the United States Court of Appeals for the 7th Circuit, in Sherman v. Community Consolidated School District 21, 980 F.2d 437 (7th Cir.1992), held that a school district’s policy for voluntary recitation of the Pledge of Allegiance including the words “under God” was constitutional.
(15) The 9th Circuit Court of Appeals erroneously held, in Newdow v. U.S. Congress (9th Cir. June 26, 2002), that the Pledge of Allegiance’s use of the express religious reference “under God” violates the First Amendment to the Constitution, and that, therefore, a school district’s policy and practice of *1028 teacher-led voluntary recitations of the Pledge of Allegiance is unconstitutional. (16) The erroneous rationale of the 9th Circuit Court of Appeals in Newdow would lead to the absurd result that the Constitution’s use of the express religious reference “Year of our Lord” in Article VII violates the First Amendment to the Constitution, and that, therefore, a school district’s policy and practice of teacher-led voluntary recitations of the Constitution itself would be unconstitutional.
4 U.S.C. § 4 (2002).
These findings make it absolutely clear that Congress in 2002 was not trying to impress a religious doctrine upon anyone. Rather, they had two main purposes for keeping the phrase “one Nation under God” in the Pledge: (1) to underscore the political philosophy of the Founding Fathers that God granted certain inalienable rights to the people which the government cannot take away; and (2) to add the note of importance which a Pledge to our Nation ought to have and which in our culture ceremonial references to God arouse.
The dissent contends that we must ignore the 2002 reaffirmation in its entirety. See Dissent at 1064-68. But the Supreme Court has rejected this mode of analysis. Again, “[t]he eyes that look to purpose belong to an objective observer ... competent to learn what history has to show,” McCreary County, 545 U.S. at 862-66, 125 S.Ct. 2722 (quotations and citations removed), and our observer’s competence will not suddenly fail her when she is presented with the most recent legislative history of 4 U.S.C. § 4.
Even if the dissent were correct that the focus of our inquiry should be the 1954 amendments to the text of the Pledge, Wallace makes clear that the 2002 reaffirmation would still be relevant. In Wallace, the Court determined whether a school prayer statute had a secular purpose by looking at, among other things, the “character” of a subsequent statute, passed a year later, which the Court described as a “sequel” to the statute at issue. Wallace, 472 U.S. at 58, 105 S.Ct. 2479. Determining the purpose of the Pledge requires understanding the history of the Pledge, and any such history is incomplete without the 2002 reaffirmation.

3. History supports Congress’ view of the Pledge.

Not only must we examine the words “under God” in the context of the rest of the Pledge, we must also examine them in the context of history. Without knowing the history behind these words, one might well think the phrase “one Nation under God” could not be anything but religious. History, however, shows these words have an even broader meaning, one grounded in philosophy and politics and reflecting many events of historical significance.
The words “under God” were added to the Pledge of Allegiance in 1954 in response to the oppressive governments forming around the World. Congress wanted to emphasize that in America, the government’s power is limited by a higher power. But to understand this concept, we must look back to the beginning of our nation.
Among the “self-evident truths” the Framers believed was the concept that all people are entitled to certain inalienable rights given to them by the “Laws of Nature and Nature’s God” and that the purpose of government should be “to secure these rights.” In the monarchies of Europe, it was believed that God gave the King his power, and the people had only such limited rights as the King graciously bestowed upon them. When drafting the Establishment and Free Exercise Clauses *1029 of the First Amendment, the Founders had this religious history of Europe in mind:
[T]o the men who wrote the Religion Clauses of the First Amendment the ‘establishment’ of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity. In England, and in some Colonies at the time of the separation in 1776, the Church of England was sponsored and supported by the Crown as a state, or established, church; in other countries ‘establishment’ meant sponsorship by the sovereign of the Lutheran or Catholic Church. See Engel v. Vitale, 370 U.S., at 428 n. 10, 82 S.Ct., at 1265. See generally C. Antieau, A. Downey, & E. Roberts, Freedom from Federal Establishment (1964). The exclusivity of established churches in the 17th and 18th centuries, of course, was often carried to prohibition of other forms of worship.
Walz v. Tax Comm’n, 397 U.S. 664, 667, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970); see also Everson v. Bd. of Educ., 330 U.S. at 8-11, 67 S.Ct. 504 (“A large proportion of the early settlers of this country came here from Europe to escape the bondage of laws which compelled them to support and attend government favored churches. The centuries immediately before and contemporaneous with the colonization of America had been filled with turmoil, civil strife, and persecutions, generated in large part by established sects determined to maintain their absolute political and religious supremacy.... In efforts to force loyalty to whatever religious group happened to be on top and in league with the government of a particular time and place, men and women had been fined, cast in jail, cruelly tortured, and killed.”).
In contrast, the Framers believed that God endowed people with certain inalienable rights, rights no government could take away and no church could regulate. These rights were inalienable by the government because they were derived from a source more powerful than, and entitled to more respect than, the government — even a democratically elected government. The government could regulate only those rights the people gave to the government. This fundamental debate — whether government has only limited rights given to it by the people, or whether the people have only limited rights given to them by the government — remains one of the crucial debates around the world to this day. Whether government is limited or unlimited has a profound impact on people’s day-to-day lives. For instance, if the police arrest an individual, in many countries, the only question is whether there is a law forbidding the arrest. If there is no such law, the arrest is legal because the government is all powerful and not to be questioned. In America, the question is what law allows the police to arrest the person. If there is no such law, then the arrest is unlawful and the person can petition the courts to be released because the government has only such power as the people have chosen to give it through their elected representatives.
■ In 1776, limited government was a rare concept. If the new government of this nation would have only limited powers, what authority limited these powers? If the people would retain certain rights that did not emanate from the government, whence came those rights? The Framers referred to the source of the people’s rights as the “Creator,” the “Supreme Judge,” and “Nature’s God.” The Declaration of Independence, 1 U.S.C. § XLIII (1776). The name given to this unknowable, varied source was not crucial, but the source was a necessary prerequisite to the *1030 concept of limited government that formed the basis of our nation’s founding.[21]
Long before this nation could be founded, the Framers had to convince the people in the American colonies that their individual rights were important enough to start a war. Important enough to die for. Important enough to send their sons to die for. We must remember the Framers urged a rationale for committing treason against Great Britain. For this, they needed to draw upon every weapon in their intellectual arsenal. They needed to call upon divine inspiration, as so many armies before them had.[22]
Alexander Hamilton argued in February 1775, “The sacred rights of mankind are not to be rummaged for among old parchments or musty records. They are written, as with a sunbeam, in the whole volume of human nature, by the hand of the Divinity himself, and can never be erased or obscured by mortal power.” Alexander Hamilton, The Farmer Refuted (1775).
And so when the Second Continental Congress of the United States met on July 4, 1776, the original thirteen states sought to convince not only the Colonists, but also the world that a higher power granted rights directly to the people, who would in turn grant only limited powers to their new government:
When in the Course of human events, it becomes necessary for one people to dissolve the political bands which have connected them with another, and to assume among the powers of the earth, the separate and equal station to which the Laws of Nature and of Nature’s God entitle them,[23] a decent respect to the opinions of mankind requires that they should declare the causes which impel them to the separation.
We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among *1031 these are Life, Liberty and the pursuit of Happiness.
The Declaration of Independence, 1 U.S.C. § XLIII (1776) (emphasis added).
“The Declaration of Independence was the promise; the Constitution was the fulfillment.” [24] The Constitution fulfilled the promise of the Declaration by creating a government of limited powers. The government was divided into three coequal but separate branches that would check and balance one another to ensure the government remained limited, and the people’s rights secure.
While the Revolutionary War was waged against the abusive King of Great Britain, the Civil War was waged against abusive State governments.[25] Many abolitionists asserted that slaves were also endowed by the Creator with certain inalienable rights that could not be taken away by the government. During his Gettysburg Address, President Abraham Lincoln called upon this higher power, using the very same phrase — “nation, under God” — to describe a belief in equality and limited government:
[T]he great task remaining before us— that from these honored dead we take increased devotion to that cause for which they gave the last full measure of devotion — that we here highly resolve that these dead shall not have died in vain — that this nation, under God, shall have a new birth of freedom — and that government of the people, by the people, for the people, shall not perish from the earth.
Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863) (emphasis added).
The original Pledge of Allegiance was drafted by Frances Bellamy in 1892: “I pledge allegiance to my Flag and the Republic for which it stands: one Nation indivisible,[26] with Liberty and Justice for all.” Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 6, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). It was published in a national youth magazine commemorating the 400th anniversary of Christopher Columbus’ arrival in America. Id.
During World War II, Congress formally codified the Pledge of Allegiance. Unlike Bellamy’s version, the 1942 Pledge referred expressly to the United States of America because there was a worry that a Pledge to “my Flag” would allow those who sympathized with other nations to appear to be supporting America, while secretly supporting Germany, Japan, or the like: “1 pledge allegiance to the flag of the United States of America and to the Republic for which it stands, one Nation indivisible, with liberty and justice for all.” Id. (citation and internal quotation marks omitted). Pub.L. No. 623, Ch. 435, § 7, 56 Stat. 380 (1942) (codified at 36 U.S.C. § 1972, now repealed).
In the early 1950s America became involved in the war waged between North and South Korea. North Korea was aided by the communist regimes of the Soviet Union and China, while South Korea was aided by the United Nations, including the *1032 United States, Australia, and Great Britain. This was just one of many times when the West opposed the spread of communism. American soldiers had just fought and died in this war, not returning until after the cease fire in July 1953. Encyclopedia Britannica Online Ed. available at http://seareh.eb.com/eb/article9046072 (last visited August 4, 2009). Indeed, America still has troops in South Korea. The tensions over the differences in political systems continue today. Id. It was while the scars of the Korean War were still fresh that Congress decided to amend the Pledge again.
In 1954, during the escalating Cold War with North Korea, the Soviet Union and other communist countries, Congress further amended the Pledge by changing the phrase “one Nation indivisible” to “one Nation under God, indivisible.” Pub.L. No. 396, Ch. 297, 68 Stat. 249 (1954). The words “under God” were added as a description of “one Nation” primarily to reinforce the idea that our nation is founded upon the concept of a limited government, in stark contrast to the unlimited power exercised by communist forms of government. In adding the words “under God” to the Pledge, Congress reinforced the belief that our nation was one of individual liberties granted to the people directly by a higher power:
At this moment of our history the principles underlying our American Government and the American way of life are under attack by a system whose philosophy is at direct odds with our own. [0]ur American Government is founded on the concept of the individuality and the dignity of the human being. Underlying this concept is the belief that the human person is important because he was created by God and endowed by Him with certain inalienable rights which no civil authority may usurp.
H.R.Rep. No. 83-1693, 1954 U.S.C.C.A.N. 2339, 2340 (May 28, 1954). The House Report adopted this statement from Representative Rabaut:
By the addition of the phrase ‘under God’ to the pledge, the consciousness of the American people will be more alerted to the true meaning of our country and its form of government. In this full awareness we will, I believe, be strengthened for the conflict now facing us and more determined to preserve our precious heritage.
More importantly, the children of our land, in the daily recitation of the pledge in school, will be daily impressed with a true understanding of our way of life and its origins. As they grow and advance in this understanding, they will assume the responsibilities of self-government equipped to carry on the traditions that have been given to us.
Id. at 2341.[27]
Undoubtedly, as the dissent sets forth in great detail, some members of Congress *1033 sought to promote religion and to combat atheism. We do not dispute that those motives do not comport with the First Amendment. Where the dissent errs, however, is in focusing solely on what individuals say when they are making political statements to their constituencies and ending its analysis there instead of also looking at what Congress did when it enacted and amended the Pledge over time. The dissent ignores the plain language of the 2002 Act — the only evidence we have of what an overwhelming majority of both houses of Congress voted for.[28] Why does the dissent ignore the language in the statute that Congress voted for? Because the Congressional findings set forth in the statute do not lead to the result the dissent desires. The dissent also ignores the inescapable fact that it is the 2002 Act that is in effect today.
The dissent points to instances where individual Congressmen proclaimed, as politicians often do in election years, the obvious religious elements of the amendment. But we are called upon to discern Congress’ ostensible and predominant purpose, not the purpose of an individual. See McCreary County, 545 U.S. at 867-68, 125 S.Ct. 2722. That purpose is not the statement of one or more individual members of Congress, but what the committees putting forth the amendment actually stated and, more important, what the text of the statute says. Id.; Mergens, 496 U.S. at 248-49, 110 S.Ct. 2356.
One related point is important. The dissent attributes one meaning to the words “under God” and proclaims that is the end of the inquiry. We are called upon to discern Congress’ purpose. We first stated what we thought the purpose of the words was in Newdow III. Congress thought we misinterpreted its purpose. See page 3903 supra. Thus, Congress set forth its reasons in detail in the 2002 Act.
Another related point is that:
It cannot be the case that Congress may override a constitutional decision by simply rewriting the history upon which it is based. For instance, Congress surely cannot negate the effect of a Fourth Amendment decision by penning its own account of the scope of lawful searches at the time of the Founding. Cf. Florida v. White, 526 U.S. 559, 563-64, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999) (“In deciding whether a challenged governmental action violates the [Fourth] Amendment, we have taken care to inquire whether the action was regarded as an unlawful search and seizure when the Amendment was framed.”).
United States v. Enas, 255 F.3d 662, 675 (9th Cir.2001) (en banc). This principle applies when Congress is trying to rewrite history, not when Congress is trying to clarify our misunderstanding of its own purpose in enacting a statute. The 2002 Congress made it clear that we had misunderstood Congress’ purpose in our ruling in Newdow III. It was thus perfectly appropriate for a different Congress to clari *1034 fy its present purpose for us by setting forth its reasons in detail in the 2002 Act. And given the margins by which the 2002 Act passed, it is clear that virtually all of the members of Congress agreed we had misinterpreted the purpose of the words “under God.”
The dissent calls the 2002 Congress’ purpose a sham but does not point to even one place where Congress is incorrect in its recitation of history. The dissent disregards the fact that the Supreme Court has also recognized that the Founders’ religious beliefs are a part of our nation’s history. “The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writing's, from the Mayflower Compact to the Constitution itself.” Schempp, 374 U.S. at 213, 83 S.Ct. 1560.
Further, it makes sense that we must examine the purpose of the most recent Congressional enactment, since under the Lemon test we are required to examine purpose.[29] Otherwise, a perfectly valid measure, with a predominantly secular effect, as is the Pledge, would forever be banned by the politically motivated statements of some legislator's (or even someone who is not in the legislature, like Reverend Docherty). The dissent’s analysis would grant a heckler’s veto to anyone who made just enough noise in support of an enactment so as to defeat an otherwise valid measure. That is not the law.

4. Secular purposes that have a religious component to them can be constitutional.

That certain enactments can have both secular and. religious purposes and still be constitutional has been recognized by the Supreme Court. “A religious purpose alone is not enough to invalidate an act of a state legislature. The religious purpose must predominate.”[30] Edwards, 482 U.S. at 598, 107 S.Ct. 2573 (Powell, J., concurring). See also McGowan v. Maryland, 366 U.S. 420, 442, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (“[T]he ‘Establishment’ Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions. In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious considerations, demands such regulation .... [T]he fact that [a policy] agrees with the dictates of the Judeo Christian *1035 religions while it may disagree with others does not invalidate the regulation.”).
We must be “reluctant to attribute unconstitutional motives” to Congress when the stated purpose of the statute is a plausible secular purpose. Mueller v. Allen, 463 U.S. 388, 394-95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). Both the purposes of inspiring and solemnizing do have a religious element to them. Nevertheless, that does not make them predominantly religious in nature. The Supreme Court has recognized that sometimes a statute has a religious purpose mixed with a secular purpose, and yet the statute does not violate the Establishment Clause. Lynch, 465 U.S. at 680, 104 S.Ct. 1355. Indeed, even in Wallace, both the majority and Justice Powell’s concurrence recognized that a statute can still be constitutional even when the statute has both secular and religious purposes. 472 U.S. at 56 & n. 41, 105 S.Ct. 2479 (majority) (holding that “even though a statute that is motivated in part by a religious purpose may satisfy the first criterion ... the First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion” and “a statute must be invalidated if it is entirely motivated by a purpose to advance religion.”); id. at 64, 105 S.Ct. 2479 (Powell, J., concurring) (“We have not interpreted the first prong of Lemon, supra, however, as requiring that a statute have ‘exclusively secular’ objectives.... If such a requirement existed, much conduct and legislation approved by this Court in the past would have been invalidated.”).
The preamble to the 2002 Act specifically mentions Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952). In Zorach, the plaintiffs brought a challenge under the Establishment Clause to a New York City program releasing children who wanted to attend classes on religion from attendance in public school for part of the day. As is the case here, no student was forced to participate in any religious exercises. Id. at 311-12, 72 S.Ct. 679.[31] Similarly, in Marsh v. Chambers, the Court held that the opening of the Nebraska legislature’s session with a prayer by a chaplain paid for with public funds was simply an acknowledgment of the role that religion played in our nation’s history. Marsh v. Chambers, 463 U.S. 783, 793, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983). There, as the Court observed, the nation’s historical practices can outweigh even obvious religious concerns under the Establishment Clause:
We turn then to the question of whether any features of the Nebraska practice violate the Establishment Clause. Beyond the bare fact that a prayer is offered, three points have been made: first, that a clergyman of only one denomination-Presbyterian-has been selected for 16 years; second, that the chaplain is paid at public expense; and third, that the prayers are in the JudeoChristian tradition. Weighed against the historical background, these factors do not serve to invalidate Nebraska’s practice.
Id. at 792-93, 103 S.Ct. 3330 (footnotes omitted).
*1036 The Court later invalidated opening a graduation ceremony with a prayer, citing the vulnerability of children. The religious component of the words at issue was much stronger; Lee involved a religious exercise. Here, a patriotic exercise is involved which only mentions the concept of “God.”
The dissent would have us strike down the Pledge because it is not exclusively secular, but contains the words “under God.” The Lemon test, however, asks whether a challenged statute or governmental action is predominantly religious or secular, not exclusively secular. McCreary County, 545 U.S. at 867-68, 125 S.Ct. 2722. This formulation makes sense because oftentimes what one person considers secular, another considers religious. For instance, even the dissent thinks the 1942 version of the Pledge was secular, yet that was the version challenged in West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 626, 629, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). Dissent at 4028-29. To the Jehovah’s Witnesses in Barnette, even the version of the Pledge that did not contain the words “under God” violated their religious freedom by causing them to pledge allegiance to something other than God. Id.
In Barnette, Jehovah’s Witnesses challenged a school board regulation requiring students to recite the Pledge and salute the flag, contending that the regulation compelled them to violate their religious prohibition against bowing down to a graven image. 319 U.S. at 626, 629, 63 S.Ct. 1178. Refusal to comply with the mandatory Pledge recitation resulted in the expulsion of the student from school and criminal penalties for his parents for the consequent truancy. Id. at 630, 63 S.Ct. 1178. The school policy did not allow students to opt out for any reason, much less without explanation, as do the schools involved here. The Supreme Court held the school policy mandating recitation of the Pledge violated the Free Speech Clause of the First Amendment, because the policy forced the students, under threat of penalty, to recite the Pledge against their wishes. Id. at 633-34, 642, 63 S.Ct. 1178. The Supreme Court did not, however, go as far as the dissent would here, and strike down the Pledge of Allegiance. The Supreme Court held that as long as recitation of the Pledge was optional, then the Pledge was constitutional. The same principle applies here. This is one of the great principles of our nation, when it comes to participating in non-violent religious exercises, or holding particular religious views: All may, none must.
In the context of the Pledge, the phrase “one Nation under God” constitutes a powerful admission by the government of its own limitations.[32] Although the phrase also has religious connotations, “one Nation under God” in the Pledge is a reference to the historical and political underpinnings of our nation. As Justice Brennan noted, “[T]he revised pledge of allegiance, for example, may merely recognize the historical fact that our Nation was *1037 believed to have been founded ‘under God.’ Thus reciting the pledge may be no more of a religious exercise than the reading aloud of Lincoln’s Gettysburg Address, which contains an allusion to the same historical fact.” Schempp, 374 U.S. at 304, 83 S.Ct. 1560 (Brennan, J., concurring).
In light of the patriotic context in which the phrase “under God” is recited and the historical context in which that phrase has been enacted into law, we hold its voluntary recitation as part of the Pledge by school children, as practiced by the Rio Linda Union School District, does not violate the Establishment Clause.
VIII. The Endorsement Test: The Pledge has neither the purpose nor the effect of endorsing religion.
For the same reasons we find the Pledge does not violate the Lemon test, we similarly find the Pledge does not violate the Endorsement Test, first articulated by Justice O’Connor in her Lynch concurrence and subsequently adopted by a majority of the Court in County of Allegheny, 492 U.S. at 578-79, 109 S.Ct. 3086. Under the Endorsement Test, we look to see whether the challenged governmental action has the purpose or effect of endorsing, favoring, or promoting religion, particularly if it has the effect of endorsing one religion over another. Id. at 593-94, 109 S.Ct. 3086. “Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community.” Lynch, 465 U.S. at 688, 104 S.Ct. 1355 (O’Connor, J., concurring).
[Under the Endorsement Test,] the question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the context in which the contested object appears: A typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content.
County of Allegheny, 492 U.S. at 595, 109 S.Ct. 3086 (internal marks omitted). In other words, under the Endorsement Test, as under the Lemon Test, the words “one Nation under God” must be analyzed in terms of the context of the Pledge, which the dissent once again fails to do.
Thus, in Wallace v. Jaffree, the Court held Alabama’s moment-of-silence statute was unconstitutional because it was “enacted ... for the sole purpose of expressing the State’s endorsement of prayer activities.” 472 U.S. at 60, 105 S.Ct. 2479. Similarly, in County of Allegheny, the Court held a nativity display with a banner proclaiming “Gloria in Excelsis Deo” unconstitutional because it was intended to convey the message that the viewer should give glory to God for the birth of Christ, a specifically Christian belief. 492 U.S. at 580,109 S.Ct. 3086.
Here, in contrast, as analyzed in detail above, both the purpose and effect of the Pledge are that of a predominantly patriotic, not a religious, exercise. The phrase “under God” is a recognition of our Founder’s political philosophy that a power greater than the government gives the people their inalienable rights. Thus, the Pledge is an endorsement of our form of government, not of religion or any particular sect.
The dissent would have us analyze the Pledge in terms of what a child reciting it may or may not understand about the historical significance of the words being recited. But a child’s understanding cannot be the basis for our constitutional analysis. The Supreme Court has expressly rejected this approach: “We decline to employ Establishment Clause jurisprudence using a modified heckler’s veto, in which a group’s religious activity can be proscribed on the basis of what the youngest members of the audience might *1038 misperceive.” Good News Club v. Milford Central Sch., 533 U.S. 98, 119, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001). Rather, the inquiry turns on how a reasonable observer would view the wording of the Pledge as a whole:
“[BJecause our concern is with the political community writ large, the endorsement inquiry is not about the perceptions of particular individuals or saving isolated nonadherents from ... discomfort. ... It is for this reason that the reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the [activity takes place].”
Id. (emphasis added) (quoting Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 779-80, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O’Connor, J., concurring in part and concurring in the judgment)). We recognize some school children who are unaware of its history may perceive the phrase “under God” in the Pledge to refer exclusively to a monotheistic God of a particular religion. A reasonable observer, however, aware of the history and origins of the words in the Pledge would view the Pledge as a product of this nation’s history and political philosophy.
IX. The Coercion Test: The Pledge does not coerce students to support or participate in religion or in a religious exercise.
This brings us to plaintiffs’ next contention, that the recitation of the Pledge in a public school classroom unconstitutionally coerces objecting students into affirming a belief in God. Even though the students in the school are not compelled[33] to recite the Pledge by threat of penalty, are they nonetheless coerced into participating in a religious exercise? Relying primarily on the Supreme Court’s decision in Lee v. Weisman, plaintiffs ask us to find they are.
We agree that the students in elementary schools are being coerced to listen to the other students recite the Pledge. They may even feel induced to recite the Pledge themselves. Although the School District’s Policy does not compel them to recite the Pledge, or even to listen to others reciting the Pledge, we recognize that elementary school children are unlikely to walk out of the classroom in protest. But the main distinction is this: Here, the students are being coerced to participate in a patriotic exercise, not a religious exercise. The Pledge is not a prayer and its recitation is not a religious exercise. The students are not being forced to become involuntary congregants listening to a prayer, as they were in Lee, 505 U.S. at 593,112 S.Ct. 2649.
Children are coerced into doing all sort of things in school, such as learning to read and to solve mathematical problems. What they must not be coerced into doing is to support or participate in religion, or *1039 engage in a religious exercise. Lee’s indirect psychological coercion analysis, by its own terms, applies only to religion or to religious exercises, which carry “a particular risk of indirect coercion.” Lee, 505 U.S. at 592,112 S.Ct. 2649.
In Lee v. Weisman, the Supreme Court addressed the constitutionality of an invocation and benediction prayer delivered by a rabbi during a high school graduation ceremony. 505 U.S. at 580, 112 S.Ct. 2649. The prayer contained repeated references and thanks to God and, throughout its opinion, the Court described the prayer as a “religious exercise.” See e.g., id. at 580-82, 588, 589, 598, 112 S.Ct. 2649. In analyzing the constitutionality of the prayer, the Lee Court adopted and applied what is now known as the coercion test: “[A]t a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise.” Id. at 587, 112 S.Ct. 2649.[34]
The Supreme Court, in a divided 5-4 decision, held the prayer failed the coercion test and was unconstitutional. Although attendance at the graduation ceremony was voluntary, the students’ participation in an event as important as a high school graduation ceremony was in a “fair and real sense obligatory.” Id. at 586, 595, 112 S.Ct. 2649. Although the students were not compelled to say the prayers, the students in attendance would nonetheless be indirectly coerced to participate in the religious exercise or at least maintain respectful silence. Id. at 593, 112 S.Ct. 2649.
The Court in Lee, however, expressly confined its holding to religious exercises. “These dominant facts mark and control the confines of our decision: State officials direct the performance of a formal religious exercise at promotional and graduation ceremonies for secondary schools.” 505 U.S. at 586, 112 S.Ct. 2649; see also id. at 599, 112 S.Ct. 2649 (“The sole question presented is whether a religious exercise may be conducted at a graduation ceremony ....”) (emphasis added).[35] The Lee Court noted the Pledge of Allegiance, with “under God” in it by then, was recited at the graduation ceremony before the challenged prayer. Lee, 505 U.S. at 583, 112 S.Ct. 2649. Although not dispositive of our inquiry, we find it telling that the plaintiffs in Lee did not challenge, nor did the Court suggest, the recitation of the Pledge was unconstituionally coercive. Lee did not rule that every mention of God or religion in public school is unconstitutionally coercive. Other Courts of Appeal examining this issue and applying Lee agree.
*1040 In holding a school policy providing for the daily recitation of the Pledge by students does not violate the Establishment Clause, the Fourth Circuit explained:
The prayers ruled unconstitutional in Lee, Schempp, and Engel ... were viewed by the Court as distinctly religious exercises. It was the religious nature of these activities that gave rise to the concern that nonparticipating students would be indirectly coerced into accepting a religious message. The indirect coercion analysis discussed in Lee, Schempp, and Engel, simply is not relevant in cases, like this one, challenging non-religious activities. Even assuming that the recitation of the Pledge contains a risk of indirect coercion, the indirect coercion is not threatening to establish religion, but patriotism.
Myers, 418 F.3d at 408 (emphasis added); see also Elk Grove, 542 U.S. at 31 n. 4, 124 S.Ct. 2301 (Rehnquist, C.J., concurring) (“[WJhatever the virtues and vices of Lee, the Court was concerned only with ‘formal religious exercise[s],’ which the Pledge is not.” (citation omitted)); Sherman, 980 F.2d at 444-47 (holding that the phrase “under God” does not turn the Pledge from a patriotic exercise into a religious exercise, and finding that the state can coerce students into performing such patriotic exercises as reciting the Pledge).
Limiting Lee’s indirect coercion analysis to religious exercises is consistent with the purposes of the Establishment Clause. Where, as here, compulsion to recite is absent, government action respects an establishment of religion only if the government coerces students to engage in a religious exercise. Coercion to engage in a patriotic activity, like the Pledge of Allegiance, does not run afoul of the Establishment Clause. The Supreme Court recognized this distinction in the earliest of the school prayer cases, Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). In Engel, the Court considered a school’s policy directing children to say aloud a prayer written by state officials. The Court found this policy violated the Establishment Clause because “[the] program of daily classroom invocation of God’s blessings as prescribed in the Regents’ prayer is a religious activity. It is a solemn avowal of divine faith and supplication for the blessings of the Almighty. The nature of such a prayer has always been religious.” Id. at 424-25, 82 S.Ct. 1261. The Court was also careful, however, to distinguish the prayer in En-gel from a ceremonial reference to God in a footnote:
There is of course nothing in the decision reached here that is inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer’s professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise that the State of New York has sponsored in this instance.
Id. at 435 n. 21, 82 S.Ct. 1261. Thus, the Court drew an explicit distinction between patriotic mentions of God on the one hand, and prayer, an “unquestioned religious exercise,” on the other. Therefore, we hold the School District’s Policy providing for the voluntary recitation of the Pledge does not violate the Lee coercion test.
X. Newdow III Does Not Constitute Binding Precedent.
Finally, we explain why Newdow III does not control our analysis. As all mem *1041 bers of our panel agree, the district court erred by holding this court’s decision in Neiodow III is binding precedent that district courts in this circuit and this court must follow. The Supreme Court in Elk Grove reversed the Newdow III decision, holding the sole plaintiff, Newdow, lacked prudential standing to challenge the constitutionality of the Pledge. Thus, the Supreme Court held Newdow III erred by reaching the merits of the case.
There is an important difference, overlooked by the district court, between a reversal on a merits ground (a question of substantive law) and a reversal on a threshold ground (a question whether the court has jurisdiction to reach the substantive law claims). Merits questions may be independent of each other; reversal on one merits ground may leave the decisions reached on other grounds intact. In contrast, when the Supreme Court reverses a lower court’s decision on a threshold question, such as prudential standing, it effectively holds the lower court erred by reaching the merits of the case. See Tenet v. Doe, 544 U.S. 1, 6 n. 4, 125 S.Ct. 1230, 161 L.Ed.2d 82 (2005) (“[T]he prudential standing doctrine [is a] ‘threshold question.’ ”). This is precisely what the Supreme Court did in Elk Grove. Because the Supreme Court held the Newdow III court erred by deciding the Establishment Clause question, Newdow Ill’s holding on that question is not precedential. To hold otherwise would give precedential effect to the determination of an issue that should never have been decided. Preiser v. Newkirk, 422 U.S. 395, 401, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975) (“[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them.”) (citations and internal quotation marks omitted).[36]
Newdow III is not binding for another, more important, reason: The law has changed. Congress, in 2002, reenacted the Pledge in response to this court’s opinion in Newdow I. It is the 2002 Congress’ purpose we are called upon to examine. The findings of the 2002 Congress make this a very different case from that evaluated by this court in Newdow I because the 2002 Congress detailed findings that make it clear the 2002 Act was enacted for secular reasons which are constitutional.[37]
Furthermore, the Supreme Court clarified the analysis to be applied to Establishment Clause cases in Van Orden and McCreary County, which came down in 2005 after our 2003 decision in Newdow III. These cases are instrumental in showing us that the majority in Newdow III (of which Judge Reinhardt was a member) used an incomplete analysis when it con *1042 centrated solely on the two words “under God.” For the reasons we express herein, we simply cannot agree that this is the correct focus under the current Supreme Court law.
XI. Conclusion
We hold that California Education Code § 52720 and the School District’s Policy of having teachers lead students in the daily recitation of the Pledge, and allowing those who do not wish to participate to refuse to do so with impunity, do not violate the Establishment Clause. Therefore, we reverse the decision of the district court holding the School District’s Policy unconstitutional and vacate the permanent injunction prohibiting the recitation of the Pledge by willing students.
REVERSED.

. Van Orden v. Perry, 545 U.S. 677, 681, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005).

. County of Allegheny v. ACLU, 492 U.S. 573, 578-79, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989).

. Lynch v. Donnelly, 465 U.S. 668, 670-71, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

. Marsh v. Chambers, 463 U.S. 783, 784-86, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983).

. Walz v. Tax Comm'n, 397 U.S. 664, 667, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

. Everson v. Bd. of Educ., 330 U.S. 1, 8-11, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

. Contrary to the dissent’s assertion, Myers and Sherman are not based solely on Supreme Court dicta. We encourage the reader to read these cases for himself for we find them to be not only well-written, but also elegantly reasoned.

. The Establishment Clause applies to the states through the Fourteenth Amendment. Everson v. Ed. of Educ., 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

. The dissent mis-characterizes our analysis on page 1079. It is not the word "under” upon which we must focus, it is the entire wording of the Pledge as a whole. If the Pledge were solely: "We are under God's rule”, would it make a difference? It would. There would be an argument that this was nothing more than a prayer. So would the Ten Commandments be a purely religious symbol if they stood alone in the Texas governmental park; so would the Nativity Creche in the Rhode Island Park, if not surrounded by a Christmas tree, Santa and a Menorah. The recognition that words or symbols change and have different meanings in different contexts is not “pure poppycock”, Dissent at 1079, unless Van Orden and Donnelly are pure poppycock.

. Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).

. Lee v. Weisman, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992). In Lee, the Court found that a prayer led by a Rabbi specifically made reference to the JudeoChristian tradition, because it was taken from Micah 6:8. See id. at 603 n. 5, 112 S.Ct. 2649. In the Pledge, the phrase "one Nation under God” does not make reference to any text, doctrine, or the practice of any particular religion in a manner that might be taken as suggestive, let alone coercive. The most likely provenance of the words is from either George Washington's address to boost his troops' morale, the Declaration of Independence, or President's Lincoln's tribute to the dead at Gettysburg. George Washington, General Orders (July 2, 1776); Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863). See pages 3903 to 3908 infra.
Much as Justice Brennan explained, the "references to God contained in the Pledge of Allegiance” are "uniquely suited to serve such wholly secular purposes as solemnizing public occasions, or inspiring commitment to meet some national challenge in a manner that simply could not be fully served in our culture if government were limited to purely non-religious phrases.” Lynch, 465 U.S. at 716-17, 104 S.Ct. 1355.

. Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

. Sch. Dist. of Abington Twp., Pa. v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).

. Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

. See e.g. Santa Fe, 530 U.S. at 306-07, 120 S.Ct. 2266 ("[T]he only type of message that is expressly endorsed in the text [of the school policy] is an 'invocation' — a term that *1021 primarily describes an appeal for divine assistance.”); Lee, 505 U.S. at 581-82, 598, 112 S.Ct. 2649 (”[T]he State has ... compelled attendance and participation in an explicit religious exercise [involving repeated thanks to God and requests for blessings] at an event of singular importance to every student.”); Wallace, 472 U.S. at 58, 105 S.Ct. 2479 ("The wholly religious character of the later enactment [of the Alabama statute] is plainly evident from its text.”); Edwards, 482 U.S. at 589, 107 S.Ct. 2573 (striking down a Louisiana statute that had the "purpose of discrediting 'evolution by counter-balancing its teaching at every turn with the teaching of creationism’ ”); Schempp, 374 U.S. at 210, 83 S.Ct. 1560 ("The reading of the[Bible] verses, even without comment, possesses a devotional and religious character and constitutes in effect a religious observance.” (citation and internal quotation marks omitted)); Engel, 370 U.S. at 424, 82 S.Ct. 1261 ("There can, of course, be no doubt that New York's program of daily classroom invocation of God's blessings as prescribed in the Regents’ prayer is a religious activity. It is a solemn avowal of divine faith and supplication for the blessings of the Almighty.”).

. The text of the Ten Commandments display in Van Orden was far more religious than the phrase "under God” at issue here:
I AM the LORD thy God. Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy. Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor’s house.
Thou shalt not covet thy neighbor’s wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.
Van Orden, 545 U.S. at 707, 125 S.Ct. 2854 (Stevens, J., dissenting).

. Alabama Code § 16-1-20.2 provided:
From henceforth, any teacher or professor in any public educational institution within the state of Alabama, recognizing that the Lord God is one, at the beginning of any homeroom or any class, may pray, may lead willing students in prayer, or may lead the willing students in the following prayer to God:
Almighty God, You alone are our God. We acknowledge You as the Creator and Supreme Judge of the world. May Your justice, Your truth, and Your peace abound this day in the hearts of our countrymen, in the counsels of our government, in the sanctity of our homes and in the classrooms of our schools in the name of our Lord. Amen.
Wallace v. Jaffree, 466 U.S. 924, 104 S.Ct. 1704, 80 L.Ed.2d 178 (1984) (holding Ala. Code § 16-1-20.2 violates the Establishment Clause).

. The Dissent asserts that we should ignore the current statute in effect because it was not argued by the parties at oral argument. With respect, just because the Dissent does not like the 2002 Act does not mean we are free to ignore its legal effect. We are charged with conducting a correct legal analysis of this case whether the parties on appeal do or not. Indeed, often issues that are not discussed at oral argument are determinative of the case. For instance, prudential standing was not argued during the oral argument in this court in Newdow I, nor did this court hold further arguments before issuing Newdow III but the Supreme Court nevertheless certainly found prudential standing to be the determinative issue in Elk Grove, 542 U.S. at 6, 124 S.Ct. 2301.

. The reenactment of the Pledge here is distinguishable from the actions of the county in McCreary County for several key reasons. First and foremost, in McCreary County it was the same governmental body which put up the challenged display, containing as "unstinting focus" on "religious passages”, that *1025 then added secular documents to camouflage that display only after an Establishment Clause challenge was brought. Here, Congress thought the Pledge as amended in 1954 was constitutional for 48 years. It re-enacted the text only because it thought that this court had misinterpreted its original purpose. Further, only one member of Congress, Senator Byrd, served in both the 1954 and 2002 Congresses. Further, unlike the late-blooming additions to the display in McCreary County, the 2002 Legislature did not add any further secular content to the Pledge to dilute the challenged words.

. We presume the 2002 Legislature's purpose is as stated, and is not a sham, because the 2002 Legislature has given us no reason to presume its stated reasons are not in fact its real reasons for the enactment. See Edwards, 482 U.S. at 586-87, 107 S.Ct. 2573. The plaintiffs have not carried their burden to show otherwise.

. After the Revolutionary War, a committee consisting of James Madison, Alexander Hamilton, and later Chief Justice Oliver Ellsworth drafted an "Address to the States, by the United States in Congress Assembled.” According to the Address, the Revolutionary War was won for the rights of human nature, rights that had an "Author”:
Let it be remembered, finally, that it has ever been the pride and boast of America that the rights for which she contended were the rights of human nature. By the blessings of the Author of these rights on the means exerted for their deference, they have prevailed against all opposition, and form the basis of thirteen independent States.
William Hickey, The Constitution of the United States of America 139-40 (1853) (emphasis added), cited in Anthony R. Picarello, Jr., Establishing Anti-Foundationalism Through the Pledge of Allegiance Cases, 5 First Amend. L.Rev. 183, 188 (2006) (filed as part of the brief for Defendant-Intervenor Carey).

. In his General Orders, George Washington invoked the phrase "under God” to inspire his troops when describing the fate of America if the King of Great Britain, with his unlimited powers, should win the Revolutionary War:
The fate of unborn Millions will now depend, under God, on the Courage and Conduct of this army — Our cruel and unrelenting Enemy leaves us no choice but a brave resistance, or the most abject submission; this is all we can expect — We have therefore to resolve to conquer or die.
George Washington, General Orders (July 2, 1776) (emphasis added), cited in Picarello, 5 First Amend. L.Rev. at 187.

.Here, Jefferson was referring to Cicero’s concept that "God himself” was the author, promulgator, and enforcer of the "universal law of justice.” Marcus Tullius Cicero, De República III, xxii. Cicero, who lived from 106 BC to 43 BC, obviously was not a Christian. Thus, this concept of God and Nature bestowing rights upon the people is not confined to the traditions of Christianity, regardless of some of the proclamations of preachers and Congressmen in 1954.

. Charles Alan Wright, Warren Burger: A Young Friend Remembers, 74 Tex. L.Rev. 213, 219 (1995) (quoting Chief Justice Warren Burger).

. Following the Civil War, the Fourteenth Amendment was added, to limit the power of the States as against the rights of the people. In particular, the Fourteenth Amendment was necessary to guard against states disregarding the prohibition against slavery found in the Thirteenth Amendment.

.Reinforcement of the idea that this nation is indivisible, a concept most Americans today would not even think was up for debate, reflects the fact that the Pledge was first drafted in 1892, not long after the Civil War.

. The dissent appears to think the historical context for the Pledge extends back no more than to the Sunday when Reverend Docherty gave his sermon. With respect, Reverend Docherty was never elected to office and, though he may indeed have delivered a moving sermon, the concept of this nation being "one Nation under God” extended back long before his time, at least to General Washington's address to his troops in 1776 and to President Lincoln's Gettysburg address in 1863. George Washington, General Orders (July 2, 1776); Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863).
We do not doubt some members of Congress were motivated to add the phrase "under God” to the Pledge to serve wholly religious ends. Nevertheless, under Supreme Court precedent, our Establishment Clause inquiry focuses solely on "the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law.” Bd. of Educ. v. Mergens, 496 U.S. 226, 249, 110 *1033 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (plurality opinion of O'Connor, J.); see United States v. O'Brien, 391 U.S. 367, 384, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.").

. The Senate passed the 2002 Act with 99 Yeahs and 1 member not voting. For the Senate vote, see http://www.senate.goy/legisl ative/LIS/roll_calLiists/roll_call_vote_cfm. cfm?congress=107 & session=2 & vote=00166 (last visited January 15, 2010).
The House passed the Act with a vote of 401 Yeahs; 5 Nays; 4 members present; and 21 members not voting. For the House vote, see http://thomas.loc.gov/cgi-bin/query/DPrl 07: 36:./temp/rl0777QQHb:: (last visited January 15, 2010).

. One can certainly question the wisdom of trying to discern a legislature’s unitary purpose and whether that purpose, even if it can be discerned, should be a part of the relevant test for Establishment Clause claims. First, it is difficult if not impossible to say that members of a Congress act with one purpose. Second, litigants challenging a governmental action do not tend to care about the government’s purpose as much as the effect the governmental action has on their lives. Third, concentrating on the purpose can lead to either striking down a facially secular action that had a religious purpose, or upholding an action with religious content where the legislature was careful to set forth a secular purpose. Although both are remote possibilities because the Lemon test has three parts and does not focus solely on legislative purpose, both possibilities highlight the potential pitfalls of including purpose in the analysis. Nevertheless, as long as we are constrained by the Lemon test, we must attempt to examine the purpose of the legislature that enacted the statute in issue, which in this case is the 2002 statute.

. Webster’s defines predominant as:
1. having ascendancy, power, authority, or influence over others; preeminent.
2. preponderant; prominent: a predominant trait; the predominant color of a painting. See http://dictionary.reference. com/browse/predominant (last visited January 20, 2010).

. Also, as is the case here, any coercion in Zorach was from fellow students, not any of the state employees. Again, the Court dismissed such coercion as not being controlled by the Establishment Clause: "The only allegation in the complaint that bears on the issue[of coercion] is that the operation of the program 'has resulted and inevitably results in the exercise of pressure and coercion upon parents and children to secure attendance by the children for religious instruction.' But this charge does not even implicate the school authorities.” Zorach, 343 U.S. 306, 312 n. 7, 72 S.Ct. 679 (1952).

. Whether Congress could have represented sufficiently the historical and political foundations of our nation with a wholly secular phrase instead of "one Nation under God” is not for us to say. The Establishment Clause does not require the government to show it has adopted the most narrow means of accomplishing its objectives by avoiding reference to religion or God wherever possible. In upholding the display of a creche as part of a City’s annual Christmas display, the Lynch Court stated that "Justice [Brennan in dissent] argues that the City's objectives could have been achieved without including the creche in the display. True or not, that is irrelevant. The question is whether the display of the creche violates the Establishment Clause.” Lynch, 465 U.S. at 681 n. 7, 104 S.Ct. 1355 (citation omitted).

. Under the School District's policy, the recitation of the Pledge is purely voluntary. Students can choose not to recite the Pledge for any personal reason and to keep that reason to themselves. No student is required to recite or even to hear the recitation of the Pledge, nor can any student be disciplined for refusing to participate. Students can also participate in the recitation of the Pledge and simply omit the words "under God” without fear of discipline. Thus, the free speech claim that was involved in Barnette, where the students were forced to say the Pledge, is not at issue in this case. 319 U.S. at 630, 63 S.Ct. 1178. We note that even though the Barnette Court held students who considered it to be against their religion could not be forced to recite the Pledge, the Court nonetheless did not hold that those students could also prevent other students who had no such religious objection from reciting the Pledge, which is what plaintiffs seek here.

. Although plaintiffs do not raise the argument RoeChild-2 is required to "support or participate” in religion, the dissent calls attention to these words in Lee. It is difficult to see how RoeChild-2 supports or participates in religion when she is neither required to recite nor even to listen to the Pledge, and when it is stipulated by her attorneys that she has never said the Pledge.

. Eight years later, in Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), the Court applied Lee’s indirect coercion test to invalidate a school policy that permitted, but did not require, students to elect a speaker to deliver "a brief invocation and/or message” before high-school football games. Id. at 298 n. 6, 301-02, 120 S.Ct. 2266. Once again, it was the nature of the activity—a prayer—that coerced those in attendance to participate in an unconstitutional exercise: "Even if we regard every high school student’s decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship.” Id. at 312, 120 S.Ct. 2266.

. The district court noted several courts have reached the merits of a case without deciding a disputed prudential standing question. True, courts have decided cases that presented "relatively easy” merits questions against the plaintiff without determining whether the plaintiff has standing. See e.g., Am. Iron & Steel Inst. v. OSHA, 182 F.3d 1261, 1274 n. 10 (11th Cir.1999). Nevertheless, no court has ever bypassed a prudential standing question to rule in favor of the party lacking prudential standing, but attempting to invoke the court’s subject matter jurisdiction as to the merits. Because the Supreme Court ruled our Newdow III court should not have bypassed the prudential standing question to rule in favor of Newdow, Newdow Ill’s ruling on the merits is not binding.

. Although the 2002 Act was technically passed before issuance of Newdow III, neither the parties nor this court addressed the effect the 2002 Act had on the analysis. Newdow III, though decided after the 2002 Act, addressed the newly raised questions of whether Newdow had standing and authority to represent his child, and did not revisit the fundamental Establishment Clause analysis of Newdow I.